IN THE MATTER OF THE CAIN HEIRS, *Appellants,*
*v.* BRIGHAM YOUNG, *Respondent.*

PARTY ENTITLED TO GOVERNMENT TITLE.—A party claiming deed for Government title, from the Mayor, under the "Townsite" Law of Congress, must show that he is an inhabitant of the town, an occupant of the ground, and has an interest in the property.

OCCUPANCY, HOW BEGUN.—The occupancy referred to must be actual, and cannot be begun by Agent, no one being allowed to take up lots by Agent.

NATURE OF THE OCCUPANCY.—The occupancy may be for residence, or for business, or use, but the residence, business, or use, must be the claimants.

RIGHT OF THE OCCUPANT.—A party having made a *bona fide* occupancy can afterwards lease the ground and still retain his rights thereto; and he may sell his claim, *provided* that no contract either for sale or lease conflicts with the requirement that the title shall be made to an inhabitant, who is an occupant and has an interest, will be recognized in deciding to whom the Government title should go.

POSSESSION OF HEIRS.—The possession by the ancestor at his death is the possession by the heirs, and minor heirs cannot give up or surrender possession except by proper suit to which they are parties.

POSSESSORY RIGHTS, HOW DISPOSED OF.—These possessory rights are treated as real estate in the manner of descent and distributions, and cannot be sold by administrators, except to pay debts incurred by the ancestor; but if they be treated merely as personal property, they cannot be sold to pay debts not incurred by the ancestor and not allowed by the Probate Court.

SALE OF ADMINISTRATOR, WHEN VOID.—An order of the Probate Court for the sale of such property to pay for improvements made years after the death of the ancestor, and whilst there was no administration, is void; the Probate Court has no jurisdiction to render it, and no sale thereunder passes any interest or title, and the party going into possession under such order and sale is a trespasser.

WIDOW'S INTEREST IN THE HUSBAND'S ESTATE.—A party buying the widow's interest in such property, can have Government title to the extent of such interest, *provided* that he becomes an occupant; but he cannot claim more than the widow's interest, and can hold only in the nature of a tenant in common with the heirs, and not adverse to them.

POSSESSION OF TRUSTEE.—The possession by one as trustee cannot be set up to support an individual claim of possession.

RIGHT OF TRESPASSER.—A claim based upon a trespass is not "rightful," and cannot be maintained.

HOMESTEAD PROPERTY, HOW DISPOSED OF.—A homestead of a family is not subject to sale by adminintrators to pay debts, nor can any part of it be given away by the widow, nor otherwise taken from the heirs, except by due process of law in suit to which the heirs are parties.

APPEAL from the Third District Court.

46

The facts appear in the Opinion.

*Baskin & De Wolfe,* for Appellants.

*Williams & Young,* for Respondents.

BOREMAN, J., delivered the opinion of the Court.

The contest in these proceedings is for the Government title to certain lands under the "Town-site" Law of Congress. The Mayor of Salt Lake City holds the title in trust for the persons entitled thereto, under the provisions of the law. The various parties to these proceedings filed their claims with the Probate Court, asking title. The heirs of Joseph Cain, deceased, prayed for title to the whole of the east half of lot 6, block 69, plat "A," Salt Lake City survey: The other parties claimed fractional parts of said half lot. These claims being conflicting, the Probate Court considered all the claims together and sub-divided the half lot amongst the parties filing on it. This sub-division not being satisfactory, an appeal was taken to the District Court. In the District Court a finding of facts was had, and judgment and decree accordingly. The Cain heirs, not being satisfied with the action of the District Court, have brought the subject, by appeal, to this Court, a motion for a new trial having been overruled.

The main question involved is as to which of these claimants are " occupants," as contemplated by the " Town-site" Law. This Statute was made for the relief of the " inhabitants " of towns and cities upon the public domain. It was made to secure to those " inhabitants " who were " occupants," the legal title, according to their " respective interests." To give one the right to a conveyance of the Government title, it must appear that he is an " inhabitant " of the town, an " occupant " of the ground to which he seeks a title, and have an " interest " in the property. The occupancy must be actual, individual occupancy, not an occupancy begun and held by Agent merely. If a person resided upon a parcel of

ground, or carried on his business upon the ground, and claimed the whole of the parcel or lot, he might have title to the whole, unless some part be occupied by another person claiming right to the title.  Then the question would arise as to which exercised acts of ownership over the disputed ground first, and to what extent, and if that be settled, then was the claim ever abandoned or given up, and if so, whose possession in good faith attached after the abandonment.

We do not think that the law of Congress ever contemplated that a party should claim title to more lots or parcels than he actually, individually occupied, otherwise a person could gain title to an unlimited amount by not occupying it himself, but by arranging with various agents that they move upon the lots and hold for him, and these agents to lay no claim to title, but let the employer claim all.  The employer might thus gain title to the various parcels or lots without ever being an occupant or an inhabitant, and could prove his right by simply showing, not his possession, but possession by other men for him—he never having been individually in possession.  Such a proceeding would be at war with the very object of the law, which was made for actual settlers and not for speculators.  A man having made a *bona fide* actual, individual occupancy, either for his residence or his business, or in some way for his own use, he may no doubt afterwards sell his right of possession—his preference or right to Government title, but he must first have been an occupant in good faith himself, and the purchaser must take actual possession also, and become an occupant.  There is nothing in the rule we lay down which prohibits contracts, leases, or sales of such interests, but they can only be made to or with "inhabitants" who can become occupants, if the right of preference in obtaining title is to be affected.  Such sales, leases, and other contracts, are not prohibited or discouraged by the law nor by the policy of the law.  The Government only says—that if the contract be with one not an "inhabit-

ant," and who does not become an occupant, such con-
tract or sale will not be recognized in ascertaining to
whom the tittle should be granted. A party in posses-
sion of any such city or town lot will be presumed to be
so in possession in his own right and for his own use and
benefit, until the contrary appears. And the possession
of the ancestor when dying is the possession of the heir,
unless the contrary appears.

These are some of the principles which will control us
in the examination of the merits and rights involved in
the proceedings at bar.

When Salt Lake City was first settled, the place was
laid out, or the laying out dictated, by Brigham Young,
Willard Richards and others, yet Brigham Young
claimed to have "exclusive control" in making the set-
tlement. Shortly after the first settlers came and the
town was laid out, certain parties, among whom was
Willard Richards, were allowed to select portions of the
city; each portion composed a number of lots or blocks,
all in a body, in order to distribute the lots to those
whom they desired to have near them. It appears that
lot 6, block 69, was among the lots selected by Willard
Richards under this arrangement. He turned the east
half of the lot over to Joseph Cain, and marked the
boundary between the east and west half; he gave Cain
possession of a house situated on the north half of this
east half, and he had the public records made to show
that this east half was the property of Cain; and there
is evidence going to show that Cain bought and paid for
the half lot. Cain moved upon the lot and lived there
until his death. He exercised acts of ownership over the
half lot, and it was assessed in his name and he paid
taxes on the same until his death, and being so in pos-
session, the current of the evidence is that he claimed
the whole of the same to the boundaries of the half lot
on every side, and that his possession and ownership of
possession were recognized by Willard Richards and the
public generally. The heirs of Willard Richards claim
nothing now in this proceeding, not having appealed, but

they have made two deeds for portions of the disputed parts, one to Brigham Young and one to William Jennings, the effect of which will be considered hereafter. At the death of Joseph Cain he was in the undisputed possession of all of said half lot, although Mrs. Ogden was living on the lot, but she claimed no ownership of the possession, and moved off shortly after Cain's death.

The Appellants claim that in the findings of fact by the District Court there has been a failure to find that Brigham Young, William Jennings, Samuel Stringfellow, George Stringfellow, and Nicholas Groesbeck, or either of them, ever have been "inhabitants" of Salt Lake City or of Utah Territory. The law, as we have stated, requires that the persons claiming must, to entitle them to deeds, be "inhabitants." Inhabitancy was an essential fact and should have been found.

The Appellants further claim that there was a failure to find that Young, Jennings, Stringfellows or Groesbeck, was in possession at the date of the entry. The law requires that the parties, or perhaps those under whom they claim, should have been in possession at the date of the entry by the Mayor. It was therefore an essential fact, and the failure to find thereon was error.

The Appellants, the heirs of Joseph Cain, take exceptions to the findings of fact made by the District Court, and allege that the material findings to which they object as erroneous, are as follows :

1. It is found " that if said Joseph Cain ever occupied or claimed the right of the possession of any portion of the north half of the east half of said lot, after he moved into the new house, his heirs and representatives soon after his decease surrendered and gave up such possession."

2. It is found that portions of the south half of the east half of said lot, formerly in the possession of the heirs of Joseph Cain, "have been sold," and the possession delivered to the persons named in the judgment and decree of the Court with the particular description of the portion which each was in possession of and entitled to.

3. It is found "that the north half of the east half of said lot has been sub-divided, and the occupancy, possession, and right of possession, have been in various persons, and that the persons named in the judgment and decree of the Court are in possession and entitled to the possession of the several particular descriptions of land given in connection with their names."

The first of these points, the alleged surrender of possession of the north half of the east half of said lot, by the heirs of Joseph Cain, after Joseph Cain's death, we consider is well taken, for we are unable to discover facts which would warrant the finding, certainly none so far as the children of Cain are concerned. They have never done anything that would indicate that they gave up or surrendered any rights which they have to such north half. The widow did not control this portion of the ground, although Joseph Cain had possession of it when he died. She said that Brigham Young claimed it, and she did not question his right—for in those days no one questioned what their leaders did, but, as she says, she would have taken the word of the leaders in those days as readily as she would that of "an angel." Such implicit confidence and faith in him were simply abused by Brigham Young, and he used it to take away from this widow and her infant children property to which he did not have the shadow of a right

The finding, therefore, of a surrender of said north half, we deem was erroneous.

The second of these material findings, to which exception is taken, has reference to a sale, which it alleges took place, of portions of the south half, which had prior thereto been in possession of the heirs of Cain. One would naturally conclude from the reading of this finding that the heirs had sold such portions as are referred to, or at least were parties to some sale. Nothing of the kind appears, however, from the evidence. The parties referred to as having been the purchasers of parcels of said south half, were Nicholas Groesbeck and the Stringfellow Brothers. Groesbeck's portion is very small,

being only sixteen (16) inches fronting on East Temple Street, and running back (west) nine rods. Not a solitary witness was introduced to support Groesbeck's claim, nor any written or oral testimony—and there is an absolute want of any evidence on the point, except an incidental reference thereto in Mrs. Cain's testimony, she saying that she sold a strip of, as she thought, that width to Mr. Groesbeck. Even then there is nothing in the evidence to show where these sixteen inches were, or how long the strip was, or that she ever delivered the possession of it to Mr. Groesbeck, or whether Groesbeck ever was in possession; nor is there anything to show that any interest of the children was intended to be conveyed, nor indeed is there anything to show whether she sold as an individual, or administratrix, or as guardian, although, as it is mentioned in connection with the sale to the Stringfellow Brothers, it might be inferred to have been a sale as administratrix. But upon this inference we could not depend. There is therefore no proof to support Mr. Groesbeck's claim, and it must fall.

The Stringfellow Brothers have allotted to them, on the north of and adjoining the parcel allotted to Groesbeck, a parcel of ground fronting on East Temple (Main) Street, sixteen feet and three inches, running back, west, eight rods, with the road privilege on the west. The road privilege was merely a written consent given by S. W. Richards and Elizabeth Cain, as individuals, and without consideration, and of course was subject to revocation at any time, even if S. W. Richards and Elizabeth Cain had the right to make it. The Stringfellow Brothers claim their parcel of ground (not including the roadway), under a sale and deed from S. W. Richards and Elizabeth Cain, administrators of Joseph Cain, deceased, made in pursuance of an order of the Probate Court. Administration on the estate of Joseph Cain, deceased, was taken out more than ten years after his death. Such is the verbal proof, and there is no other kind of proof that any administration was ever taken out. S. W. Richards and Elizabeth Cain, claiming to be ad-

ministrators, filed their petition in the Probate Court on
November 4th, 1869, praying "for an order to sell real
estate," upon the ground that the estate was at that date
"involved in consequence, of loaning money to erect
buildings thereon, upon which interest is being paid, and
also in consequence of taxes accumulating, while rents
have been rapidly declining, by which the obligations
and the expenses of the estate have to be maintained."
There is no evidence that when administration was taken
out, any debts or other obligations of the deceased re-
mained unpaid, but, on the contrary, the administrator,
Richards, testifies that no such claims were ever presented
to him, and that he believed they were all paid out of
the personal effects of the deceased long before applica-
tion was made to sell the real estate, and that the sale
was made to raise money for support of the family, to
pay for improvements, taxes, &c., and that all this in-
debtedness accrued from three to ten years after Cain's
death; and Mrs. Cain says that the sale was not made
to pay debts incurred by Joseph Cain, deceased. What
interest then passed by such sale, and the conveyance
thereunder. The Probate Court is an inferior Court, one
of limited·jurisdiction. It has no powers not given to it
by Statute.

Our Territorial Statute (Utah Laws 1852, p. 44, Sec.
16) says that personal and real property may both be
sold upon the order of Court; but it does not authorize
the real estate to be sold except to pay debts, and then
only when the personal property is insufficient to pay the
charges against the estate. These facts must appear
affirmatively. The parties to this proceeding, and also
the administrators, treated these possessory rights as real
estate. The Statute likewise treated them as real estate,
for the Statute speaks of real estate, and none existed if
these rights be not such, for they were the highest inter-
est that an individual could have to land when the
Statute was passed, and it is not to be presumed that the
Statute was not meant to apply to them, but only to
something that did not then exist.

Whether they are strictly real estate or not as understood at Common Law, we are inclined to hold that the laws of those early dates intended them to be treated as real estate.  But whether we deem such possessory rights as real estate or as personal property, we are unable to see how such property could be sold under the law referred to concerning the decedents' estates.  If it was personal property it was not claimed to be of a "perishable nature," or likely to "depreciate in value." But it may be said that although this property was not "perishable," or liable to "depreciate," and although no debts, existing against the estate at the death of Joseph Cain, deceased, remained unpaid, yet that year after his death a large indebtedness was incurred against his estate.  Who was authorized to incur such indebtedness ? There was no administration.  The property had descended to the heirs and could not be taken away from them by an administration, unless debts incurred by Joseph Cain in his life time remained unpaid.  The guardian might incur debts for the support and education of the children, but this is not a case of that kind.  Some unauthorized person, years after Cain's death, puts up improvements on the land of the heirs of Joseph Cain, and it is sought to pay therefor by taking out letters of administration and selling the property under the administration.  That cannot be right.  And further, the administrators had no authority whatever to pay debts and charges against the estate, even if in existence, until they were proven in manner prescribed by law and allowed by the Court, and the administrator cannot pay for the support of the widow and children, except under the order of Court.  No debts were proven up and no allowance for support made.  But really all these charges, including the taxes, were against the heirs, if against any one at all, and the administration had nothing to do with them.

The sale, therefore, under which the Stringfellow Brothers claim, being unauthorized by law—the Court having no power to make it—the sale and conveyance

are null and void, and the parties take nothing by them. They are therefore upon the ground, if at all, wrongfully, and can only be treated as trespassers, and trespassers can have no rights as against the true and rightful claimants.

Next adjoining the "Stringfellow" ground lies that which was allotted to the Cain heirs, about which there is no contest, except, perhaps, as to a small piece on the back part of the lot.

Adjoining on the north the parcel allotted to the Cain heirs, lies the "Ransohoff" property, as it is called. It is part of the south half of this east half lot, and was allotted by the District Court to William Jennings, it being No. 51, with extension back. Jennings claims the ground under a chain of quit claim deeds from Elizabeth Cain, through Charles King, Ransohoff, and Brigham Young to himself. The quit claim deed of Mrs. Cain purported to convey only "her right of claim, interest and possession." Of course, such a deed conveyed no interest of the minor heirs, if they had any. Did they have any?

The Territorial Statute says that if there be "other property" remaining, it shall "descend in equal shares to his children," the widow taking a child's part during her life or widowhood. The interest which her deed therefore purported to convey was only equal to a child's part during her life or widowhood, and at her death or marriage, it became the property of the two children. Under that Statute, therefore, the children of Cain had a valid and perfect right to a title for two thirds of said parcel, with the further right to the residue at the death or marriage of their mother. And we can see no reason why such a Statute of descents is not valid. Utah Laws, p. 43, Sec. 24. It in no way affected the "primary disposal of the soil;" it does not seem to be inconsistent with any law of Congress, and it is a proper subject of Territorial legislation.

If, therefore, Jennings was in possession, it was only as co-occupant with the heirs. His interest could only

be that of the widow—one-third interest for the life or widowhood of Mrs. Cain. He cannot by having possession of such an interest thereby obtain a right to oust the two heirs. He only becomes a co-occupant with the heirs; a possession in the nature of a tenancy in common. The Courts are generally inclined to guard the interests of minors, and will not allow them to be deprived of any rights except under proceedings by proper suit to which they are parties. The conveyances set up as the foundation of Jennings' claim, recognize and support the rights of the children. They are a recognition of Joseph Cain's rights, and that is a recognition of theirs. But there is no evidence that Jennings ever went into possession of this property. Then in saying to whom the Government title should go, his claim could not be recognized. If he had gone into possession under Mrs. Cain's title, he would have complied with the requirements of the United States Statute, which is that to be recognized as being entitled to the Government title, the party must be an " occupant," and this he was not at any time. He can therefore have no right to any share in the property. If he has any remedy it is against Mrs. Cain. He shows no right to a preference in the purchase of the Government title.

Let us look, then, at the third point—the exception to findings respecting the north half of this east half lot, together with the strips or parcels claimed by Jennings across the whole west end of the east half lot.

The first allotment to William Jennings was No. 45, according to the plat, including its entension somewhat further west than is indicated by the plat.

In 1861, Brigham Young deeded " all of his right of claim, interest and possession," in and to said parcel of ground to William Jennings. It nowhere appears that Young had any " right of claim," "interest" or "possession" to convey. He, therefore, could convey none. He himself says that whatever possession he might have had was as Trustee-in-Trust for the Church, of which he is the head, and not as an individual. The Church has

made no conveyance and lays no claim to the lot, and files no declaratory statement therefor. The deed, therefore, from Young to Jennings is valueless, although there is testimony to show that Jennings intended to have Young make his title good.

There is evidence that Jennings was at one time "in possession of and exercised ownership" over the Eagle Emporium building, situated on No. 45. But he was not in possession at Cain's death, and there is no evidence that he was in possession at the entry of the "town-site" by the Mayor. The character of his possession is not shown—it not being shown that he lived there or did business in such building. Nor does it appear that he held possession by consent of the heirs. If his possession was not by their consent, legally obtained, by proper action to which they were parties, they being under age, their rights are in no way bound or affected by his possession. It is not claimed that any such suit was ever had.

If, therefore, Jennings went into possession under authority given by Brigham Young in his deed, and depended upon Young's supposed power to compel a good title to the possession from Cain's heirs, and Young has failed to be able to compel such title, Jennings cannot make the heirs bear the consequences, but he must look to Young for his remedy. The heirs are not bound by any arrangement he and Young may have made.

Jennings, therefore, being in possession at one time, was there wrongfully, and as a trespasser, and gained no rights which could be recognized in ascertaining to whom the legal title should be made. This finding and the allotment following to Jennings, were therefore erroneous.

The last parcel allotted to Jennings is fifty-six feet north front, on First South Street. The west twenty-six feet of this north front, running clear across the lot, are upon the west half of lot 6, and not contested, and therefore not to be disturbed by this Court.

The east sixteen feet of the remaining thirty feet of

said allotment, is held under no deed, or any other kind of transfer or possession, and if Jennings be in possession, it was, as in the last instance, as a trespasser, as to the Cain heirs, no authority from said heirs having ever been obtained.    The allotment of this sixteen feet front (and running south) to Jennings, was therefore erroneous.

Now, respecting the fourteen feet lying between the twenty-six and the sixteen feet referred to, there is some doubt.

Price seems to have been in possession in 1866–7 of forty feet north front, running south across the lot.    We hear no more of him until in 1869, when he makes a deed to William Jennings of forty feet front and running across the lot, and the fourteen feet in question is embraced therein.    In giving his testimony, Price says that he does not know what distance from the east line of the lot his ground was situated, and the great preponderance of testimony is that Price's possession was on the west half of the lot, and not the east half.    The simple fact that Price's deed fixes 151 feet as the distance from the east line of the lot, does not prove that the deed from Eddins to him gave the same description, or that Eddins put him in possession of the same; and the evidence shows that Eddins' ground was west of center of the lot, and we cannot say that the statement in Price's deed should override the testimony of numerous witnesses, and the very actions of Dr. Richards himself, especially when Price does not seem to have been in possession for some twelve years before his deed was made.

A deed is also shown in evidence from Willard Richards' heirs to Jennings, covering this fourteen feet.    But that deed is subsequent to Jennings' filing, and besides, we think that the evidence clearly shows that the Richards' heirs had no rights or interests in such property or the possession to pass by such conveyance.

The deed, of course, is of no value so far as this fourteen feet are concerned.    There is some evidence going to show Jennings' possession, although the evidence is very indefinite as to the precise ground possessed by him.

His possession, however, was without authority and wrongful, and in no way can invalidate the rights of the heirs of Joseph Cain, deceased, when they have given no consent thereto, and it was subsequent to the death of Joseph Cain, deceased.

The remaining portions of said findings objected to, as stated, refer to parcels allotted to Brigham Young by the District Court, and numbered 47 and 49 with extensions back to the west.

Brigham Young testifies that he never lived on any portion of lot 6, now in controversy. Yet he claimed to have had peaceable possession of portions of it, for many years, not in his individual right, but as Trustee-in-Trust for the Church of which he is the head. The Church making no claim, his possession as Trustee—if it ever existed—would affect nothing in the present proceedings. But he really never was in possession as contemplated by the Statute. The fact that he sent Mrs. Ogden down to Joseph Cain with directions to him to measure her off a piece for a house, gave him no rights, as her occupancy was only temporary, and so intended; and he had never been in possession prior thereto. It was evidently only an exercise of that "exclusive control over the settlement" which he had claimed, but which gave him no right in or to the real estate. It was a permission from Joseph Cain to Mrs. Ogden to use the ground for a time, and not a transfer of his right thereto.

Jennings claims also under a deed from Williard Richards' heirs, made only a few days before the filing of his declaratory statement. He had never had possession under that deed, and all of Williard Richards' right had been transferred to Joseph Cain in his life time. The fact that two women, Mrs. Braddock and Mrs. Franklin, who held the relation of polygamous wives to Williard Richards, residing a short while on the lot after it was transferred to Cain by Richards, does not show that Richards still claimed said lot. Such an inference would be very slight when compared with Richards' own positive acts, showing the contrary.

The occupancy by these women was not Richards' occupancy.    The law does not recognize the polygamous relation, and that is all that gives color to the idea that their possession was his possession.    They laid no claim to the possession themselves, and removed at the request of Cain.    Joseph Cain had lived in that house himself before these women were there and used to rent it, and rented it after they removed.    There seems nothing in the evidence to warrant the belief that there remained in the heirs of Willard Richards any—even the slightest —claim or right to any part of this half lot.

Brigham Young says in his testimony that he does not own parcel No. 47, but that it belongs to the Co-operative Institution.    His deed to Basset and Roberts shows that he conveyed to them all his interest in that parcel in 1865, and he says himself that it was never deeded back to him ; yet he claims it.    His claim has no foundation in justice.    He was never an occupant of No. 47, or of No. 49 within the meaning of the statute, and can have no right therein.    His claim was only such as any one of a thousand men on the street might set up and be able to maintain with as strong evidence as he has done.    It is simply a claim—for title—and that is all there is in it.    He has shown no right to the title. It was therefore error to allow his claim.

The heirs of Joseph Cain, deceased, had possession of this whole half lot when Joseph Cain died, and they never gave up that possession, and they are not bound to submit, because being under age the control of the lot passed from them without their consent.    They had until their majority to enforce their claims.

But there is another reason why none of these claimants, aside from the heirs of Joseph Cain, deceased, can possibly have any rights to any of this half lot.    Joseph Cain died leaving that property, the whole half lot, in the possession of his wife and children as a homestead.

The Territorial statute says : "The homestead occupied by the wife or any portion of the family of the deceased at the time of his death, shall in all cases be held

free to the use of wife and family of the deceased, and *shall
not be liable to any claim or claims against said estate.*"
What authority did the Probate Court have to order the
sale of it, even to pay debts if any existed ?    What right
did the widow have to sell any of it, or to give up pos-
session to others as against the heirs ?    Certainly none.
It shall be held "free to the use of the wife and family,"
and she cannot curtail this right in the heirs.

If she had no authority to sell even to pay debts, she
certainly could not give the property away to the detri-
ment of the minor children, which it is claimed that she
virtually did do as to the north half.    She says that
Brigham Young claimed it, and she submitted to his
claim.    That does not arise however, to the dignity
of a gift.    It was only yielding to a claim, which she
could not oppose or repel.

The Courts cannot recognise that any individual has
the right to go upon property which has descended to
infant heirs and to hold such property because the heirs
cannot drive them off, and then to come into a Court of
Equity and claim title based upon his trespass.    Such a
trampling upon the rights of infant heirs, those who look
with strongest claims to the Courts for protection, can-
not be tolerated, but the rightful possessor and claimant
must be reinstated in his rights and given the legal title.

There seems therefore no valid reason why the heirs
of Joseph Cain, deceased, should not have title to the
east half lot in question.    Therefore the judgment of the
Court below is reversed, and it is ordered and adjudged
in this Court, that the children and heirs of Joseph Cain,
deceased, have the right to title in fee-simple to the un-
divided two-thirds interest in said half lot, and that the
widow has the right to title to one undivided third inter-
est for life or widowhood, with remainder in fee to the
children and heirs ; and it is ordered that the Mayor
convey accordingly.

SCHAEFFER, C. J., concurs.